16 P.3d 1189 (2000)
171 Or. App. 616
PORTLAND ASSOCIATION OF TEACHERS and Denise Poole, Petitioners,
v.
MULTNOMAH SCHOOL DISTRICT NO. 1, Respondent.
(UP-72-96; CA A101623)
Court of Appeals of Oregon.
Argued and Submitted March 15, 1999.
Decided December 27, 2000.
*1192 Paul B. Gamson, Portland, argued the cause for petitioners. With him on the brief was Smith, Gamson, Diamond & Olney.
William H. Walters, Portland, argued the cause for respondent. With him on the brief was Miller, Nash, Wiener, Hager & Carlsen, LLP.
*1193 Before LANDAU, Presiding Judge, and LINDER and BREWER, Judges.
LINDER, J.
Petitioners Portland Association of Teachers (PAT) and Denise Poole seek review of an order of the Employment Relations Board (ERB) dismissing petitioners' complaint against Multnomah County School District No. 1 (the district), in which petitioners alleged that the district engaged in an unfair labor practice under ORS 243.672. ERB determined that petitioners failed to establish an unfair labor practice because, among other reasons, they did not prove that the district's action in determining what classes Poole would be assigned to teach was motivated by Poole's exercise of a protected activity. For the reasons we explain below, we reverse and remand.
We draw our summary of the facts from ERB's findings, which petitioners do not challenge. Poole has been a teacher at Sellwood Middle School for 11 years. She is certified to teach elementary and basic math. In her time at Sellwood, Poole primarily has taught math, but she periodically has taught elective courses such as physical science, marine science, and consumer issues. Beginning with her second year at Sellwood, Poole regularly taught at least one advanced math class each semester. She considers the advanced math classes to be desirable assignments. In the 1994-95 school year, Poole received a positive performance evaluation indicating that she met or exceeded the district's teaching standards.
Poole has been an active member of PAT for many years. At the time of the hearing before ERB, she had been a director on the PAT Executive Board for three years and a member of the grievance committee for six years. She was a PAT delegate to various state and national conventions and training programs. During the 1995-96 contract negotiation year, Poole was a "cluster organizer," which meant that she was responsible for organizing the activities of 50 to 100 "building organizers." In that capacity, she attended meetings, developed work plans, communicated with bargaining organizers regarding the progress of negotiations, and made telephone calls and visited buildings to recruit members to participate in organizing activities. Under the collective bargaining agreement between the district and PAT, Poole was entitled to take leave for PAT activities, and PAT was required to reimburse the district for the costs of substitutes due to those absences. In the spring of 1995, PAT and the district began negotiating for a new collective bargaining agreement. Negotiations were difficult and time-consuming, but they resulted in an agreement that was ratified on March 26, 1995.
Under the collective bargaining agreements over the years, Poole has been entitled to different types of leave in addition to PAT leave. Under the agreement in place at the time of ERB's hearing, she was annually entitled to 10 days of sick leave, 3 days of family illness leave, 1 to 3 days of funeral leave, 3 days of personal business leave, 2 to 4 days of professional leave, and 3 days of unpaid personal leave. In the four years between the 1990-91 school year and the 1993-94 school year, Poole missed a total of 122 days of school. She took 23 days of PAT leave, 8 days of personal business/emergency leave, 5 days of family illness leave, 66 days of sick leave, 7 days of professional leave, 6 days of funeral leave, 1 day for a field trip, 5 unspecified leave days and 1 unpaid leave day. During the 1994-95 school year, Poole missed a total of 31 days of school: 14 days of PAT leave, 13 days of sick leave, 2 days of family illness leave, 1 day for an emergency, and 1 day of professional leave. During the 1995-96 school year, Poole missed 50 days of school: 30 days of PAT leave, 10 days of sick leave, 4 days of professional leave, 3 days of personal business/emergency leave, and 3 days of unpaid leave. During the 1996-1997 school year, up to the time of the hearing in May 1997, Poole had missed 33 days of school: 14 days of PAT leave, 10 days of sick leave, 3 days of personal business/emergency leave, 3 days of family illness leave, and 3 days of professional leave.
Poole has never been disciplined for excessive absences or misuse of leave. At the end of the 1994-95 school year, however, Sellwood Principal John Alkire spoke to Poole about her absences and told her that her *1194 absences were negatively affecting other teachers. He suggested that Poole provide better lesson-planning for substitutes to minimize the disruption caused by her absences. Before the start of the 1995-96 school year, Alkire received letters from several parents voicing concerns about Poole's teaching abilities and her absences and requesting that their children not be placed in Poole's math classes. Alkire met with Poole and told her of the parents' concerns. During the 1995-96 school year, which was the contract negotiation year in which Poole was absent 30 days for PAT activities, Alkire again received letters from several parents expressing concerns about Poole's absences. Once, in November or December 1995, when Poole submitted a leave request for PAT activities, Alkire noticed the request and asked Poole if there were other people who could perform some of her PAT duties. He also questioned Poole as to why PAT activities were always scheduled for the afternoons and expressed concern that Poole's afternoon classes were being adversely affected.
From December 1995 through March 1996, Alkire received more complaints from parents about Poole's teaching ability, absences, lack of continuity, eating in class, and poor parent-teacher communications. In February 1996, Alkire sent Poole a memorandum regarding one particular parental complaint and expressed concern that Poole's absences were having a negative effect on the jobs of other teachers who were assigned to her students when she was absent. On February 9, 1996, one parent sent a letter to Poole directly, raising concerns about his child's performance and the effect of Poole's frequent absences. That same parent then sent a February 12 letter to Alkire expressing similar concerns. Poole responded to issues raised in those letters, but the parent was not satisfied with the response. The same parent then wrote to the district and the PAT president, asking for the dates of and the reasons for Poole's absences and challenging the legitimacy of Poole's use of leave time. On February 21, 1996, Alkire and Sellwood Vice Principal Debbie Bradway met with four parents who had complained about Poole. One parent filed a "formal" complaint against Poole regarding her performance in the classroom. At Poole's request, Alkire discussed the matter with a representative of PAT, who told Alkire that Poole's use of PAT leave time was unusually high in the 1995-96 school year because of contract negotiations. On March 1, 1996, Bradway saw Poole entering the building after classes had begun and made a remark that upset Poole and caused her to write a memorandum asserting the right to use contractual leave time.[1]
On April 16, 1996, Alkire wrote a letter to Poole suggesting that she transfer to a different school:
"I am concerned with the complaints of parents, students, and peers regarding your absences. I know that as a member of the PAT executive board you have a legal right to attend meetings and work with the association. I respect that, but at the same time I have concerns with the level of your commitment to the education of children at Sellwood."
Later in the letter, Alkire wrote:
"I believe that it would be in your best interest and the best interest of Sellwood School if you were to transfer to another school. You have the skills to be a good teacher, but you do not have support from the Sellwood community to continue here."
Poole told Alkire that she did not want to transfer.
That same month (April 1996), the district announced that, because of budget cuts, it would lay off teachers for the coming school year. The staff reductions at Sellwood caused the school to reduce the number of its math classes by a third. Jim McNeely, a teacher at Sellwood who held a basic advanced math endorsement, was among those to be laid off. Alkire approached Poole and asked her if she would be willing to develop a computer elective. Poole replied that she *1195 had no background in computers and was not interested in teaching computers. In June 1996, Alkire notified Poole that her assignment for the 1996-97 school year would include three math classes and three computer classes. Alkire indicated that money would be available over the summer for planning and curriculum development for the computer classes. Alkire told Poole that she would not be assigned any advanced math classes because of parental concerns and the fact that she had missed so much time. He also told her that the new assignment might not be permanent and that they would review it after one year. Unlike her past year's assignment, Poole's new assignment required that she travel between two classrooms located on different floors of the building. As a result of the layoffs, several other teachers received assignments for the 1996-97 school year that they considered less desirable because of the class subject, the fact that they had to change rooms for their classes, and the fact that they were required to travel between classes. In some of those other cases, the distance between classes was much farther than in Poole's case. Those teachers were reassigned despite their unhappiness with the reassignments. In August 1996, Poole received her final assignment and learned that the district had assigned some advanced math classes to McNeely, who was called back from layoff, and one advanced math class to Ray Amling, who formerly was the computer teacher and who held no math endorsement.
Petitioners asserted in their complaint that, by reassigning Poole, the district engaged in an unfair labor practice. Specifically, they alleged that, because of Poole's absences, all of which are permitted under the collective bargaining agreement, the district changed Poole's assignment "in a negative way" by having her teach computer classes, which it knew she did not want to teach; by refusing to assign her advanced math classes, which she preferred to teach and had been assigned to teach in recent years; and by giving her room assignments that inconvenienced her in taking comfort breaks.[2] Petitioners further alleged that the district's actions had the natural and probable tendency to chill the exercise of protected rights by Poole and other members of the bargaining unit.
In its answer to the complaint, the district conceded that it reassigned Poole and asserted that, in doing so, it considered the effect that her excessive absences had on the instruction of the students. The district further asserted that Poole's "excessive" absences were considered "with particular consideration being given to finding an assignment for [her] in which her absences would have less impact on the instruction of students." In its post-hearing brief to ERB, after the evidence had been developed, the district pointed with greater specificity to several factors as leading to Poole's reassignmenti.e., a significant change in staffing because of budget cuts, parental complaints about Poole's absences, the effect of her absences on student learning and other teachers, and a shift in the curriculum at the school to expand and enhance the computer classes.
ERB resolved the dispute in the district's favor. Both ERB's orders and petitioner's challenges to ERB's decision are best described against the backdrop of the legal principles that apply in this area. We therefore begin by outlining those principles, and we then turn to ERB's orders.

I. ANALYSIS OF UNFAIR LABOR PRACTICE CLAIMS
ORS 243.662 provides that an employee has the right to "participate in the activities of labor organizations * * * for the purpose of representation and collective bargaining." To protect that interest, ORS 243.672(1)(a) makes it an unfair labor practice for a public employer to "[i]nterfere with, restrain or coerce employees in or because of the exercise of rights guaranteed in ORS 243.662." Subsection (1)(a) encompasses two *1196 distinct prohibitions: (1) restraint, interference, or coercion "because of" the exercise of protected rights; and (2) restraint, interference, or coercion "in" the exercise of protected rights. As to the first, the emphasis is on the reasons for the employer's action: Why did the employer do what the employer did? As to the second, the emphasis is on the consequences of a particular action: Is the natural and probable effect of that action to deter employees from exercising a protected right? See generally Joseph Education Association v. Joseph School District No. 6, 16 PECBR 626 (1996). Thus, motive is an element of a "because of" claim; a complainant therefore must establish that the employer was motivated by the exercise of the protected right to take the disputed action. Amalgamated Transit Union, Division 757 v. Tri-County Metropolitan Transit District, 17 PECBR 780, 787-88 and n. 8 (1998); OPEU and Termine v. Malheur County, 10 PECBR 514, 520 (1988).[3] For an "in" claim, however, neither motive nor the extent to which employees actually were coerced is controlling; the essential issue is only whether, objectively viewed, the action that the employer took under the particular circumstances would chill union members generally in their exercise of protected rights. OPEU and Termine, 10 PECBR at 521.
In this context, as in others, motive rarely is susceptible to proof by direct evidence. A "because of" claim therefore frequently turns on circumstantial evidence that will permit an inference of motive. To establish a prima facie case based on an inference of motive, the complainant must show: (1) an exercise of a protected activity; (2) an "adverse" employment action; and (3) a connection between the two sufficient to infer a causal relationship between them, such as close proximity in time. Id. at 520; Monroe Elementary Education Association v. Monroe School District No. 25J, 13 PECBR 54, 69-70 (1991).
Significantly, however, the prima facie showing, in and of itself, does not raise a presumption in favor of a complainant or otherwise shift a burden to the employer. Instead, it merely permits motive to be inferred, leaving the trier of fact free to infer it or not. Lane County Public Works Assn. v. Lane County, 118 Or.App. 46, 51-52, 846 P.2d 414 (1993). Consequently, even though a complainant comes forward with a prima facie casei.e., evidence of a protected activity, an adverse employment action, and a connection between the two suggesting a causal nexusERB still must be persuaded to draw the inference that the employer acted "because of" the protected activity. If ERB is so persuaded, thenand only thena burden shifts to the employer to produce evidence that some reason other than the protected activity motivated the decision to take a particular employment action. Id. As we observed in Lane County Public Works Assn.:
"One who merely establishes a prima facie case and rests does not necessarily win even if the opponent adduces no evidence whatsoever and merely relies on a denial of alleged wrongdoing. The trier of fact may, in such instance, decline to draw the permissible inference necessary to establish liability. Indeed, the trier of fact may disbelieve the evidence adduced to establish the fact from which the inferred fact is to be drawn. In either case, the party with the burden of persuasion would lose. On the other hand, were the trier of fact to believe the evidence adduced to prove the primary fact and then draw a permissible inference that establishes the charge, an employer who rests without adducing evidence will lose."
Id. at 51-52, 846 P.2d 414 (quoting City of Portland v. Bureau of Labor and Ind., 298 Or. 104, 114-15, 690 P.2d 475 (1984)).
As a practical matter, in a proceeding before ERB, the elements of a prima facie case and the theoretically shifting burdens of proof drop out of the analysis *1197 once a full contested case hearing has been held. As ERB has explained, satisfaction of those initial burdens bears on whether a claim goes to a full hearing for resolution of factual questions:
"The proper focus on the prima facie case should be in the investigation stage of complaint processing. The requisite elements of the prima facie case are the bar the complainant must clear in order to proceed to hearing; a prima facie case is really a pleading requirement. A complainant must allege that the employee engaged in protected activity, that the employer took some action against the employee, and that there is a sufficient connection between the protected activity and the employer's action to suggest a causal relationship. The causal connection is typically based on proximity in time between the protected activity and the employer's action, coupled with attending circumstances that suggest something other than legitimate reasons for the temporal tie. To state a prima facie case, the complaint must be sufficient that, if the employer failed to answer or defend against the allegations, a violation would be found. When the employer offers some legitimate explanation for its action, then questions of fact or law that require a hearing are presented."
Amalgamated Transit Union, Division 757, 17 PECBR at 787. At a contested case hearing, resolution of the claim no longer focuses on whether the parties' initial burdens are satisfied but instead ultimately reduces to which party's explanation is the more persuasive and credible:
"At hearing, the complainant is obliged to produce evidence in support of its allegations that the employer acted for an unlawful reason, and the employer must produce evidence of a legitimate reason for its action in order to refute those allegations. If, after all the evidence from both parties is in, the facts persuade this Board that the reason the employer acted was to `coerce, restrain or interfere with' the exercise of protected rights, the complainant will prevail because we will have concluded that the employer's stated reason was a pretext. If, on the other hand, the facts persuade this Board that the employer had both legitimate and unlawful reasons for its action, we must further weigh the facts to decide if the employer would have taken the same action absent its unlawful reason. If we conclude that it would not have so acted, the complainant will prevail. Thus, our role in weighing the evidence and finding facts is to decide which party's explanation of the employer's reasons we believe."
Id. Thus, at the conclusion of the evidentiary hearing, the focus correctly shifts from the elements of a prima facie case to the more fundamental inquiry of whether ERB, as the trier of fact, is persuaded from the accumulated evidence that the employer has taken action that "restrains, interferes with, or coerces" an employee and was motivated to do so by the employee's exercise of a protected activity.
If the aggrieved party seeks review by this court, our review likewise should focus not on the elements of a prima facie case or shifting burdens of proof but rather on ERB's resolution of the merits of the claim. The ultimate issue of whether an employer acted coercively and was motivated to do so by the exercise of protected activity is a factual determination, one that ERB must make considering the nature of the action taken and the circumstances in which it was taken. In testing whether the record supports ERB's resolution of that issue, we review for whether ERB has correctly identified the applicable legal principles; we further review for substantial evidence and for substantial reason. See generally ORS 183.482(8). Substantial evidence to support a finding of fact is evidence that, viewing the record as a whole, would permit a reasonable person to make that finding. ORS 183.482(8)(c); Armstrong v. Asten Hill Co., 90 Or.App. 200, 206, 752 P.2d 312 (1988). In reviewing for substantial reason, however, we go one step further: We examine not only the evidence that supports ERB's findings but also the reasoning that leads ERB from the facts that it has found to the conclusions that it draws from those facts. See Drew v. PSRB, 322 Or. 491, 500, 909 P.2d 1211 (1996). Specifically, we review ERB's reasoning for *1198 whether ERB correctly interpreted and applied legal principles in the individual case before it, and whether it did so consistently with other similar cases rather than arbitrarily or ad hoc. Id.

II. ERB'S RESOLUTION OF PETITIONERS' "BECAUSE OF" CLAIM
Against that backdrop, we turn to ERB's resolution of petitioners' "because of" claim. Our review in this case is complicated by the fact that ERB analyzed the issues in a way that it since has disavowed (correctly, we agree) as unduly "formulaic."[4] Specifically, ERB examined whether the evidence satisfied the elements of a prima facie case; it did not explicitly address the ultimate issue of whether ERB was persuaded, under the totality of the circumstances, that the district interfered with, restrained, or coerced Poole "because of" her exercise of a protected activity. Nevertheless, fairly understood, ERB ultimately resolved the case based on whether it was persuaded from the district's actions and the circumstances in which those actions were taken that the reassignment was coercive action motivated by a protected activity. ERB's reference to the discrete factors of petitioners' prima facie case appears to reflect ERB's "reasoning" for why ERB drew the particular conclusions that it did. We review ERB's decision with that understanding.
ERB's resolution is embodied in two orders: an original order and an order on reconsideration that affirmed the original order and supplemented ERB's analysis. In the first order, ERB ruled in favor of the district based on a conclusion that the district's actions in denying Poole's requested assignment could not be considered "adverse." ERB reasoned that it is not enough that the employer's action be contrary to the employee's preferences; instead, the action taken must be detrimental or harmful in an "employment-related" way. ERB explained:
"The crux of Poole's complaint about her new assignment is that she did not get to teach what she wantedall math classes with at least one advanced math class. Merely because Poole did not receive the assignment she preferred does not mean that the District took adverse action against her. She was not disciplined. She suffered no loss of pay or benefits.
"* * * In order to be considered adverse, it is not enough that an assignment is contrary to the employee's preference. An adverse assignment is one that is detrimental or harmful, not one that is merely less desirable. Considering all the attending circumstances, Poole's 1996-97 teaching assignment cannot be considered an adverse action."
(Emphasis in original; footnotes omitted.)
After ERB issued its original order, petitioners moved for reconsideration, essentially arguing that ERB had demanded more of the test's "adverse action" prong than was appropriate to serve the statute's policy. According to petitioners, "adverse" should be only shorthand for those actions that restrain, interfere with, or coerce protected activity, and, here, the reassignment plainly had that effect. Petitioners argued that ERB's decision necessarily meant that, whenever a district was motivated to remove a teacher from a desired job assignment because the teacher engaged in union activity of any type, the teacher would be without recourse under the statute. In petitioners' view, that result was out of step with the statutory policy and contrary to other cases decided by the *1199 Board. ERB, in its order on reconsideration, rejected petitioners' arguments, explaining:
"Complainants posit a number of awful circumstances, which they claim will inevitably result from our holding that the District's action did not amount to adverse action. We would caution the parties here, as well as other interested readers, about reading more into the Order than it says. Each case alleging a violation of (1)(a) must be judged on its own unique facts, and it would be a mistake to read this Order as deciding more than the specific question presented. This case neither establishes any expansive new principles to be applied in reviewing (1)(a) cases, nor abandons the time-honored principles applied in the past.
"In considering the facts of this case, we concluded that the District's action did not amount, under the circumstances, to unlawful adverse action. Put another way, we concluded that Poole suffered no employment-related harm. That conclusion was entirely consistent with prior Board cases cited in the Order that considered whether certain employer conduct amounted to adverse action against an employee. After reviewing the facts again, we remain convinced that under the circumstances of this case Poole's reassignment did not amount to employment-related harm."
ERB also addressed petitioners' claim that ERB did not follow its own precedents in which, in arguably analogous circumstances, ERB found reassignment decisions to be adverse action that fell within the prohibition of ORS 243.672(1)(a). ERB explained that, in those cases, ERB had found a direct connection between the employee's exercise of a protected activity and the reassignment decision. In this case, in contrast, ERB found that there was no such direct connection.[5]

III. PETITIONERS' CHALLENGES TO ERB'S DECISION
A. "Adverse action" as a component of the legal analysis
In petitioners' first assignment of error, they challenge ERB's use of the "adverse action" element in the analysis, arguing that it is "ERB's creation" and does not reflect the legislative policy expressed in ORS 243.672(1)(a). Petitioners contend that the proper inquiry is only whether the employer took action that, in the express language of the statute, "interfere[d] with, restrain[ed] or coerce[d]" an employee because of the exercise of protected rights. Thus, according to petitioners, to satisfy that requirement, employer action may be favorable as well as adverse. As an example, they hypothetically posit a district giving "an extra $1,000 to employees who do not attend their union meetings," contending that rewards and similar favorable inducements can be just as effective as negative or adverse treatment in deterring union activity.
The concern that petitioners raise in this regard is unfounded. ERB did not hold in this case, nor has it held in any other case of which we are aware, that favorable treatment cannot form a basis for an unfair labor practice. To the contrary, in one of its earliest decisions, ERB recognized that a claim of restraint or coercion under the statute can be predicated on a "promise of favoritism" made to employees in an effort to coax them to "bypass" protected rights or activities. See Bend Education Association v. Bend School District No. 1 and Kenneth Reinke, 4 PECBR 2617, 2622 (1980). ERB has since stood by that early recognition:
"While [coercive action under section (1)(a)] is typically `adverse,' it need not necessarily be so. For example, a promise of benefits made with the purpose of dissuading employees from exercising protected rights would be unlawful because of its purposeto interfere with, restrain, or coerce protected rightseven though it is not `adverse.'"
Oregon Public Employees Union v. Jefferson County, 18 PECBR 128, 138 n. 4 (1999).
Petitioners therefore are simply wrong as to the analysis that ERB follows. The point of the "adverse action" inquiry is that the detrimental nature of an *1200 employment action provides a basisbut not an exclusive oneupon which an unlawful motive can be inferred in a "because of" claim, thus establishing a prima facie case. ERB considers the adversity of the employer's action in those cases in which the employee relies on allegations of detrimental or negative conduct as a basis to infer an unlawfully motivated employment action.[6]
This was such a case. Petitioners sought to establish their claim by characterizing the district's action as adverse. In particular, their complaint expressly alleged that the district "changed Ms. Poole's assignment in a negative way because of her protected activity." (Emphasis added.) They then argued in their post-hearing briefing that the district's action was adverse in that Poole's class assignments were less desirable and she was inconvenienced by having to change classrooms. Based on that asserted adverse nature of the district's action, coupled with the other circumstances involved, petitioners urged that they had established a prima facie case of an unfair labor practice. In responding to petitioners' claim, ERB merely analyzed it in the same terms in which petitioners had framed it.
Consequently, we reject petitioners' challenge to ERB's legal analysis. That challenge does not describe ERB's legal approach accurately or in full. More fundamentally, the challenge fails to acknowledge that ERB's analysis in this particular instance was responsive to the way in which petitioners presented their claim.
B. ERB's conclusion that the district's action was not adverse
We turn to petitioners' second assignment of error, which challenges ERB's conclusion that the district's action in this instance was not "adverse" and thus did not establish a violation of the statute. Petitioners argue that the facts, properly considered, establish "as a matter of law" that the reassignment was adverse. They rely primarily on the "undisputed testimony" that teaching computers, instead of math, would create extra work for Poole and that she preferred teaching advanced math over computers. According to petitioners, the district's employment action fell within what the statute prohibits because Poole was given "less desirable" classes "solely because [she] engaged in union activities."
Petitioners' position in that regard recognizes that adversity in this case depends on the motivation for the reassignment rather than the fact of the reassignment, without more. In other words, petitioners do not contend that the district's failure to give a teacher his or her preferred class assignment would necessarily and always be "adverse" within the scope of the statute. Indeed, such a position would be at odds with the collective bargaining agreement itself, which expressly reserves to the district the unqualified right to make all personnel assignments. Petitioners' position, instead, is more modest: They contend only that a less desirable teaching assignment qualifies as adverse treatmentand, hence, coercive employer actionif a district's motivation for a teacher's reassignment is that teacher's exercise of a protected right.
In our view, that is exactly how ERB approached the issue. ERB did not conclude that a teacher's reassignment to a less desirable *1201 class or schedule could never qualify as coercive or other unlawful action within ORS 243.672(1)(a). Rather, ERB determined only that this reassignment was not adverseand hence, coercivebecause ERB was not persuaded on this record that the district was motivated to reassign Poole by her exercise of a protected activity. See generally NLRB v. Great Dane Trailers, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967) (where the inherent harm to employee rights is comparatively slight, unlawful motivation must be established to prove coercive employer action). Thus, petitioners' argument on this point ultimately depends on their challenges to ERB's conclusion that the district was not motivated to reassign Poole because of her exercise of a protected right. We therefore turn to those challenges.
C. ERB's conclusion that the district did not reassign Poole because of her protected activities
Petitioners raise two assignments of error that are directed to ERB's conclusion that the district was not motivated to reassign Poole "because of" her protected activities. First, petitioners argue that Poole's use of leave pursuant to the collective bargaining agreement was a protected activity and that, to the extent that ERB concluded otherwise, ERB erred as a matter of law. Second, petitioners argue that, to the extent that ERB concluded that Poole was reassigned because of the disruptive effect of her absences, rather than the absences per se, the causal nexus between her protected activity and the employment action is necessarily established because, "but for" the absences, she would not have been reassigned. A more detailed examination of ERB's resolution of that particular issue is necessary to place petitioners' arguments in context.
ERB's explanation for concluding that the district did not reassign Poole because of her exercise of a protected right is reflected in the combination of its original order and its order on reconsideration. In its original order, ERB focused on the fact that Poole was one of several teachers who, because of staffing reductions and curriculum changes, did not receive their preferred assignments. ERB explained:
"While Poole was assigned to a subject she had not previously taught, other teachers likewise were assigned to teach subjects they did not want to teach and had either not taught before or had not taught recently. In addition, the total number of math classes available for assignment had been reduced by three, and Poole had taught other subjects in the past. Although she did have to change rooms between classes, other teachers had similar or more onerous changes necessitated by reassignments."
As earlier noted, ERB also focused on the fact that the reassignment resulted in a less desirable teaching assignment but no greater employment-related harm. Essentially, ERB declined to find that Poole had been treated adversely, despite the fact that the reassignment was "less desirable," because it found that she was not singled out and treated in any uniquely adverse way in the course of the annual teacher assignment process.
In petitioning for reconsideration, petitioners argued that ERB's conclusion in this case was directly contrary to its decisions in PAT and Bailey v. Multnomah County School District # 1, 9 PECBR 8635 (1986), and OACE, Briggs and Ramsey v. Douglas School District No. 4, 12 PECBR 547 (1990). In PAT and Bailey, a school district declined to give a teacher a desired teaching assignment because, if the teacher prevailed, a pending grievance would result in a further reassignment, which the district considered unduly disruptive to the students. ERB found a "because of" violation in that circumstance. Likewise, in OACE, Briggs and Ramsey, ERB found a "because of" violation where the employee, a mechanic, was transferred from his preferred assignment to something less desirable because of his union organizing activities. Relying on those cases, petitioners contended that ERB had departed significantly from its prior precedent in rejecting the "because of" claim in this case.
In its order on reconsideration, ERB explained that the cases petitioners relied on were ones in which ERB found a direct connection between a reassignment decision *1202 and a protected activity.[7] ERB determined that the same connection was lacking in this case:
"Here, by contrast, the evidence leads us to conclude that Poole's reassignment was based on her absences from the classroom, whatever their reason. But for her absences, some of which were for PAT activity and some of which were for other reasons, Poole would not have been reassigned. The direct connection we found in PAT and Bailey and OACE, Briggs and Ramsay linking the employer's action with protected activity is not present in this case. The fact that some absences were for PAT activity is incidental. In order to succeed on the (1)(a) claim, Complainants had to prove by a preponderance of the evidence that the District would not have reassigned Poole but for her protected activity. Complainants failed to meet that burden. The District did not reassign Poole because she was absent for protected activity; it reassigned her because she was absent."
(First emphasis added; second emphasis in original.)
On review, petitioners challenge ERB's distinction between the consequences of Poole's absences and her protected activity as "difficult to comprehend" and urge that ERB's decision may reflect one of two rationales: (1) that ERB found that Poole's absences, or at least those for personal as opposed to union activities, were not protected activity; or (2) that ERB found no causal link between Poole's protected activity and the district's decision to reassign her. As to the first possible rationale, petitioners contend that all of Poole's absences, for personal as well as for union activities, qualify as protected activities as a matter of law. As to the second possible rationale, petitioners assert that ERB's own findings defeat itthat is, that ERB agreed and found that Poole would not have been reassigned "but for" her absences.
We agree with petitioners that ERB's reasoning on the issue of the district's motivation is difficult to discern. As petitioners observe, ERB implicitly may have concluded that absences for so-called "PAT activity" (e.g., strike planning, negotiation, and other union activities) qualified as "protected activity," whereas absences for purely personal leave authorized under the contract did not. That distinction is suggested by ERB's finding that "[t]he fact that some absences were for PAT activity [was] incidental" to the district's reassignment decision and the district "did not reassign Poole because she was absent for protected activity; it reassigned her because she was absent."[8] Petitioners argue that, to the extent that ERB's order *1203 rests on that reasoning, ERB was wrong as a matter of law.
Assuming that ERB implicitly so reasoned, we are not prepared to conclude that it erred. Neither, however, are we prepared to conclude that ERB was correct. The problem that confronts us is that ERB did not explain its conclusion sufficiently for us meaningfully to review it. As petitioners point out, ERB has previously determined that an exercise of rights secured by a collective bargaining agreement may be "concerted activity connected to a labor organization" within the meaning of ORS 243.662 and, thus, a "protected activity" for purposes of ORS 243.672(1)(a). Central School District 13J v. Central Education Association, 17 PECBR 54 (1996). But in Central School District 13J, ERB concluded only that the particular contract right asserted in that casean employee's right to be represented in a meeting with potential disciplinary consequencesqualified as concerted activity connected to a labor organization. On review, we affirmed, holding that ERB's conclusion in that regard was within its delegated "authority to determine the range of activities" protected by the statute. Central School Dist. 13J v. Central Education Assoc., 155 Or.App. 92, 94, 962 P.2d 763 (1998). Neither ERB's decision in that case nor our affirmance of it stands necessarily for the proposition that any and all uses of contractually bargained-for benefits qualify per se as "concerted activities."
ERB's order leaves us to read between the lines in an attempt to determine if ERB's reasoning is predicated on a conclusion that Poole's absences for personal reasons (e.g., sickness, vacation, personal leave, and unpaid leave) are not "concerted activity," whereas her absences for union activities are. Were we to attempt to review that conclusion on the order as it stands, we would have to do so without the benefit of ERB's explicit analysis on the point. We are not inclined to decide whether ERB correctly interpreted the law in this regard without first knowing how ERB interpreted the law. ERB's analysis and reasoning is particularly important here given ERB's delegated interpretive authority to determine what activities qualify as concertedand, hence, protectedactivities within the meaning of ORS 243.672(1)(a). See id. at 94, 962 P.2d 763; see generally Olney School Dist. 11 v. Olney Education Assoc., 145 Or.App. 578, 931 P.2d 804 (1997) (similarly concluding that ERB has considerable interpretative authority with regard to other provisions of ORS 243.672).[9]
For that reason, a remand to permit ERB to explain its reasoning is appropriate, unless ERB's conclusion on motivation is supported by some other independent rationale. Here, it may be. Petitioners acknowledge that ERB's decision may reflect a determination that the district had a legitimate "business" reason for its action. Indeed, that was the crux of the district's defense to petitioners' claim. In its answer to the complaint, the district denied that Poole was reassigned because she engaged in protected activity and asserted that the decision instead was based on the excessive number of Poole's absences, "with particular consideration being given to finding an assignment *1204 for Ms. Poole in which her absences would have less impact on the instruction of the students." ERB made extensive findings on the number and frequency of Poole's absences, their effect on her advanced math students and on other teachers, parental concerns about that effect, and the staffing reductions and curriculum changes that precipitated a need for reassignment of teachers generally. As ERB stated later in its order on reconsideration: "The `message,' if any, sent by the District's action is that frequent and numerous absences from the classroom, which have a demonstrable effect on student learning, may result in a reassignment."[10]
Thus, in concluding that there was no "direct connection" between Poole's protected activity and the district's decision, a fair understanding of ERB's decision is that ERB accepted the district's position that the district was not motivated to reassign her because she exercised a protected right to take contractually bargained-for leave; rather, the reassignment was motivated by the effect of Poole's absences on student learning in her advanced math classes. Petitioners assert that, even if ERB's order is so understood, that reasoning is flawed. According to petitioners, because the "absences are the protected activity" (emphasis in original), ERB logically cannot treat the effect of the absences as separate and distinct from the protected activity itself. Petitioners insist that as long as the district contractually agrees to allow teachers to be absent for specified purposes, the district's recourse is to negotiate changes in the collective bargaining agreement, rather than to take action against teachers who exercise their right to be absent.
In making that argument, petitioners argue that we should analyze the district's motive by assessing whether "but for" Poole's exercise of her contractual leave rights, the district would have reassigned her. The "but for" test that petitioners invoke is one that ERB follows in so-called "mixed-motive" cases. As discussed earlier, in resolving a "because of" claim under ORS 243.672(1)(a), factual disputes for a hearing arise when the complaint pleads a prima facie case and the employer answers the allegations by asserting a legitimate reason for its action. See Amalgamated Transit Union, Division 757, 17 PECBR at 786-87. Typically, the complainant will then assert that the employer's legitimate reason is a "pretext"i.e., a sham explanation based on some circumstance, fact, or concern that did not in truth exist; or the complainant may assert that the employer had mixed motives for the employment action and that the unlawful motivation was a substantial factor in the action. See, e.g., Monroe Elementary Education Association, 13 PECBR at 69-72. See generally Hardie v. Legacy Health System, 167 Or.App. 425, 433-35, 6 P.3d 531 (2000) (generally discussing "pretext" and "mixed motive" in the labor law area). In pretext cases, ERB's task is to decide what and whom to believe in determining which competing explanationthe union-related one or the legitimate business onewas the actual reason for the employment action. See, e.g., Spray Education Association and Walt Short v. Spray School District No. 1, 11 PECBR 201, 223-25 (1989) (analyzing pretext claim). In mixed-motive cases, ERB's task is to decide whether the unlawful motivationas one of two or more coinciding reasons for the employment actionwas a sufficient factor to attribute the decision to it. To make that determination, ERB uses a "but for" test and asks whether "but for" the protected activitythat is, in the absence of the protected activitythe employer would have made the same decision. See, e.g., OSEA v. Coos Bay-North Bend Water Board, 5 PECBR 4176, 4184 (1980) (citing Vaughn v. Pacific Northwest Bell Telephone, 289 Or. 73, 611 P.2d 281 (1980)).[11]
*1205 Petitioners contend that ERB expressly found that "but for" Poole's absences, she would not have been reassigned and that they necessarily satisfied their burden to prove that the district's action was motivated by Poole's exercise of a protected activity. Our problem with that argument is two-fold. First, it assumes that ERB did not determine that the union-activity leave was protected activity and that strictly personal leave was not. As we have already discussed, we are unsure whether that was ERB's reasoning. If it was, that fact would explain how ERB could conclude that the district reassigned Poole because of her absences more generally but not specifically for her protected activity. The case must be remanded to ERB for clarification if that possible reasoning would be determinative.
Second, even if we accept for present purposes that any and all individual use of contractual leave is a protected activity, we disagree that the "but for" test applicable to mixed-motive cases is the proper analysis in this context. To be sure, both a legitimate and an unlawful motivation for Poole's reassignment can be identified here. The legitimate motive would be the district's desire to reduce the effect of Poole's frequent absences on the students in her classes and on the other teachers. The illegitimate motive would be the district's reassignment as a direct response to Poole's exercise of her right to use personal leave. Those motives are not independent and distinct, however. They are, instead, potentially different ways of characterizing the same concern on the district's part.
The "but for" test that ERB uses in mixed-motive cases is not particularly helpful in this context. The hypothetical construct of that test assumes that one motive can be present without the other, so that we can assess the role that each played in the employer's decision.[12] Here, the "legitimate" and the "illegitimate" motives are not severable, but are arguable ways of characterizing a single motive. This case illustrates why a "but for" test does not assist in the analysis in such a case. Using a "but for" test here, we would ask: Would the district have reassigned Poole if student learning in her advanced math classes were suffering but she had not taken any leave time (i.e., she had engaged in no "protected activity")? The answer, based not only on ERB's findings but also on the parties' theories, is plainly yes. Or, we could state the question in the converse: Would the district have reassigned Poole if she had taken leave time but there had been no demonstrable effect on student learning? The answer, based on both the record and the parties' theories, is plainly no. Either way the question is framed, it is clear that the district's concern was the effect of Poole's absences on student learning in her classes and that Poole's use of leave time, without that effect, would not have resulted in a reassignment.
But that is not a satisfying answer to petitioners' "because of" claim. If use of leave time in contractually bargained-for amounts typically would result in the kind of effects that arose in connection with Poole's use of leave, then reassigning Poole because of those effects is the functional equivalent of reassigning her for the use of the leave itself. That may have been ERB's conclusion as well. ERB recognized that, but for Poole's absences, she would not have been reassigned. That fact did not persuade ERB, however. ERB appears to have based its decision instead on whether the connection between Poole's exercise of a protected right and the effect of her absences was sufficiently "direct" to deem the district to have been motivated by the protected activity per se.
In that respect, this case is analogous to those in which an employer's concern arises out of or in connection with an employee's exercise of a protected activity, but the concern is not the protected activity itself. For example, in one case before ERB, an employee *1206 was denied a transfer because the supervisor of the new position believed that he and the employee could not work well together. Lane County Public Works Association, Local 626 and Theodore Bushek v. Lane County, 13 PECBR 187 (1991). The legitimacy of the employer's concern (a good working relationship) in the abstract was not questioned. The problem, however, was that the supervisor's opinion of the employee was based on the employee's demeanor while performing duties as a union spokesperson. As ERB observed, the case presented a different question from the usual mixed-motive case because "the `good' and the `bad' reasons for the denial of [the employee's] transfer" could not be "clearly separated." Id. at 198. ERB rejected the idea that an employer legitimately never could base a personnel decision on a concern arising out of or in connection with the performance of a protected activity. Id. at 199.[13] ERB found, however, that the manner in which the employee in that case had performed his union activities was not unusual; consequently, the employer could not rely on that concern. Id.[14]
ERB's analysis in that and similar cases suggests at least a possible analysis for cases of this kind: whether the employer's concern is sufficiently integral to or inherent in the exercise of the protected activity that basing an employment decision on that concern is equivalent to basing it on the protected activity itself. ERB's focus in this case on whether there was a "direct connection" between the protected activity and the motivation for the employment actionhere, the effect of Poole's absencesis at least one potential way to make that determination. Said another way, the fact that there is some causal link between a protected activity and the employer's motive for a personnel action is not determinative in a case where the "good" motive is in some sense derivative of the "bad" one. What is determinative is the strength of the causal link.
In the context of this case, assessing the strength of the causal link between the district's concern and Poole's use of leave would require determining whether, when teachers use leave pursuant to the contract, student learning generally can be expected to suffer in the same ways and to the same extent as happened here. In that regard, we agree with petitioners that, if the district has struck an unwise bargain in the collective bargaining agreement, the district's obligation is to negotiate for changes in those provisions, not to alter them unilaterally by burdening the employee's exercise of the rights. But whether that principle is implicated here depends on whether the effect of Poole's absences is sufficiently inherent in the exercise of the bargainedfor leave. If it is, then the district's concern bears a sufficient connection to the protected activity itself that the district may be deemed to be acting because of the exercise of that right when it addresses the effect of the exercise of that right.
Our difficulty in reviewing ERB's determination in this case is that ERB provided no explanation of its conclusion that there was no direct connection between Poole's use of protected leave and the district's concern with its effect on her students. Nor did ERB make factual findings that might better support or implicitly explain its conclusion. For example, the record suggests a dispute as to whether Poole prepared adequate lesson plans for substitute teachers so that they could continue lessons in the advanced math *1207 class without significantly impairing the students' progress. The record also suggests that advanced math courses present greater demands than other courses in terms of the need for good lesson plans, organized course work, and special qualifications of substitute teachers. There is also evidence that other teachers have taken significant leave without having similar effects on education of the students in their classes. ERB, however, made no findings on those or similar factual disputes.[15] Nor did ERB otherwise address the strength of the connection between Poole's use of leave time and the effect of that use on the students in her advanced math classes other than to say, in a purely conclusory way, that it was not a direct one.[16]
Thus, ERB's order is not supported by substantial reason. ERB has not provided us with the reasoning that led it from its factual findings to its conclusion that the district's reasons for reassigning Poole were not directly connected to Poole's protected absences. Indeed, it is not clear to us whether ERB made all the factual findings necessary for that conclusion. In all events, without some further explanation, we cannot determine either the adequacy of ERB's findings, the correctness of the legal analysis it applied nor whether ERB's decision is consistent with its decisions in its other cases. See generally Drew v. PSRB, 322 Or. at 500, 909 P.2d 1211. As we said on another occasion, brevity is not always a virtue. Home Plate, Inc. v. OLCC, 20 Or.App. 188, 190, 530 P.2d 862 (1975). When, as here, the legislative grant to the agency is a particularly broad one, the importance of a detailed and precise explanation of the agency's findings and reasoning is all the greater. Id. at 191, 530 P.2d 862. Consequently, this possible alternative rationale for ERB's orderthat ERB determined that there was not a sufficient causal link between the protected activity and the district's motivationlikewise requires a remand to ERB.[17]
In summary, we reject petitioners' argument that ERB applied the wrong legal test in this case by considering whether the district's reassignment decision was "adverse" employer action. We also find no error in ERB's conclusion that the reassignment challenged in this case was not adverseand, hence, not coercive actionunless it was motivated by Poole's exercise of a protected activity. But we are unable to meaningfully review ERB's conclusion that the reassignment was not so motivated, because ERB's order leaves considerable uncertainty as to the precise basis of and reasoning for its conclusion in that regard. To borrow from another court, an intelligent exercise of our appellate powers compels us to ask for the elimination of obscurities and ambiguities on the conclusions and reasoning fundamental to the resolution of the issues in this case.[18]
Reversed and remanded.
NOTES
[1] According to Poole, the remark was, "Do you work in this building?" Bradway denied making that particular remark. Instead, her testimony was that she was unsure whether Poole was working that day because Poole had been absent for several days and she therefore asked Poole if she was working at Sellwood that day. ERB found it unnecessary to resolve that factual conflict.
[2] The complaint also alleged that the district did not assign her any TAG (i.e., talented and gifted) students and instead assigned her students with behavioral and learning problems. ERB determined that those allegations were unfounded, and petitioners do not challenge that determination.
[3] As ERB's decisions further establish, the required showing is not one of anti-union animus or other hostility toward the exercise of the protected right. OPEU and Termine, PECBR at 520; Monroe Elementary Education Association v. Monroe School District No. 25J, 13 PECBR 54, 69-70 (1991). The requirement is only that there be a direct causal nexus between the protected activity and the employer's action.
[4] In Amalgamated Transit Union, Division 757, 17 PECBR at 786, ERB clarified the correct analysis as follows:

"The analytical process in [ORS 243.672](1)(a) cases has become increasingly formulaic. That formula typically begins with a discussion of the complainant's requirements to prove a prima facie case: exercise of protected activity; employer adverse action; some connection between the two to support the inference of a causal relationship. The focus then shifts to the employer's burden of advancing a legitimate explanation for its conduct. Finally, the formula returns to the complainant's ultimate burden of proving either that the employer's explanation is a pretext or that, where the employer had both lawful and unlawful reasons, it would not have taken the complained-of action but for the exercise of protected activity. The result of this approach has been an unwarranted attention to the elements of the prima facie case and shifting burdens of proof at the expense of examining the reasons the employer did what it did."
(Emphasis in original.)
[5] We quote and discuss ERB's conclusion in that regard in greater detail later in addressing petitioners' challenges to that portion of ERB's opinion.
[6] Oregon's Public Employees Collective Bargaining Act (PECBA), including ORS 243.672, was adopted to model the National Labor Relations Act (NLRA), 29 USC §§ 151-169. We therefore may look to cases decided under the federal actand particularly to cases decided before 1973, the year in which PECBA was adoptedfor guidance in interpreting PECBA. Elvin v. OPEU, 313 Or. 165, 177, 832 P.2d 36 (1992).

ERB's approach is consistent with the settled federal approach under the NLRA. Before 1973, the federal courts and the National Labor Relations Board (NLRB) considered the "adverse" nature of an employment action in assessing the employer's motive and the coercive nature of the employer's conduct. See NLRB v. Great Dane Trailers, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967). They have continued to do so. See, e.g., NLRB v. Transportation Management Corp., 462 U.S. 393, 401, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983); Ajax Paving Industries, Inc. v. NLRB, 713 F.2d 1214, 1216 (6th Cir.1983). The federal analysis acknowledges, however, that in appropriate circumstances, favorable conduct may also establish an unfair labor practice. See NLRB v. Exchange Parts Co., 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964).
[7] Specifically, ERB explained:

"In PAT and Bailey, this Board concluded that the district's denial of Bailey's reassignment request would not have occurred but for Bailey's pending grievance. We found a direct connection between Bailey's protected activity of filing a grievance and the District's action of denying the reassignment request. Though the district later advanced alternative reasons for its denial, the record established that the denial was motivated by the pending grievance. In OACE, Briggs and Ramsay, this Board concluded that the employee would not have been reassigned but for his involvement in a union organizing campaign. The evidence led us to decide that the district's proffered reasons for the reassignment were pretextual."
(Emphasis added.)
[8] A comparison of the hearing officer's proposed resolution and ERB's order reinforces the possibility that ERB found some but not other absences to be "protected activity." The hearing officer, in the proposed order, determined that Poole's absences for union activity were protected but that the other absences were not. Consequently, the hearing officer viewed this as a "mixed-motive" casethat is, one involving a lawful motive (the non-union related absences) and an unlawful one (the union-related absences). As a factual matter, the hearing officer further found that the union-related absences significantly increased the amount of time that Poole was out of the classroom and that the district reassigned Poole because of that increase. The hearing officer therefore concluded that the district reassigned Poole "because of" her union-related absences. ERB reached an opposite finding on that factual point, apparently concluding that the union-related absences did not play a distinct role in the district's decision. Thus, ERB's conclusion that Poole's "protected activity" was not the reason for the reassignment may indicate that ERB agreed that only the union-related absences were "protected activity" but disagreed with the hearing officer's conclusion that the district's reassignment decision was motivated by those absences in particular.
[9] ERB's holding in Central School Dist. 13J was an adoption of the so-called "Interboro" doctrine, under which the NLRB deems an individual employee to have engaged in "concerted activity" if he or she asserts a right grounded in a collective bargaining agreement. Interboro Contractors, Inc., 157 NLRB 1295 (1966). Before 1973 (the year in which Oregon's statutes were enacted) federal courts were not in accord as to how far the Interboro doctrine should extend. Some circuits limited the doctrine to circumstances in which the individual employee intended to induce group activity or effectively represented the broader interests of the union members generally in pursuing an individual grievance. See, e.g., Aro, Inc. v. NLRB, 596 F.2d 713, 717 (6th Cir.1979); NLRB v. Northern Metal Co., 440 F.2d 881, 884 (3rd Cir.1971). The Supreme Court's decision in NLRB v. City Disposal Systems, Inc., 465 U.S. 822, 104 S.Ct. 1505, 79 L.Ed.2d 839 (1984), eliminated that split in the circuits by declaring that Congress's intent was unclear and that the NLRB's understanding was entitled to deference. In endorsing the NLRB's use of the Interboro doctrine, however, the Supreme Court left open the possibility that "at some point an individual employee's actions may become so remotely related to the activities of fellow employees that it cannot reasonably be said that the employee is engaged in concerted activity." Id. at 833 n. 10, 104 S.Ct. 1505. Thus, even as a matter of the parallel federal law in this area, it is not clear that all private rights and benefits conferred by a collective bargaining agreement per se qualify as "concerted activity."
[10] This quote comes from the portion of ERB's order rejecting petitioners' claim under the "in" prong of ORS 243.672(1)(a). Petitioners acknowledge that ERB's discussion in that portion may reflect and illuminate its reasoning in resolving petitioners' "because of" claim.
[11] Vaughn was an employment discrimination case arising under ORS chapter 659 (unlawful employment practices). Significantly, in adopting a "but for" test for mixed-motive cases in that context, the Oregon Supreme Court borrowed from cases decided under the NLRA. Vaughn, 289 Or. at 91, 611 P.2d 281.
[12] As we recently observed in Hardie:

"Butfor causation is a hypothetical construct. In determining whether a particular factor was a butfor cause of a given event, we begin by assuming that factor was present at the time of the event, and then ask whether, even if that factor had been absent, the event nevertheless would have transpired in the same way."
167 Or.App. at 434 n. 6 (quoting Price Waterhouse v. Hopkins, 490 U.S. 228, 240, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)).
[13] ERB gave as an example that "an employer might legitimately consider an employee's lack of math skillseven if that knowledge was gained by observing the employee at the bargaining tableif that person requested a job that required such skills." Id. at 199 n.15.
[14] See also and compare Central Education Association and Alfonso Vilches v. Central School District 13J, 17 PECBR at 54, 70 (1996) (employee's attitude in asserting protected rights was not sufficiently outrageous to remove protection for it) and International Association of Firefighters, Local 1395 v. City of Springfield, 15 PECBR 39, 49 (1994) (similar) with Klamath County Peace Officers Association v. Klamath County and Klamath County Sheriff's Office, 17 PECBR 515 (1998) (employer could investigate possible police officer misconduct even though information about the misconduct arose in connection with protected union grievance) and Amalgamated Transit Union, Division 757, 17 PECBR at 786-88 (employer could discharge employee even though employer reviewed facts supporting the discharge only because employee brought grievance to challenge his suspension).
[15] Worth noting is that the hearing officer addressed at least some of those factual points. The hearing officer declined to conclude, for example, that Poole's organization and similar skills were deficient, because no such deficiencies had ever been noted in her performance evaluations.
[16] In suggesting this analysis, we do not foreclose any other that ERB may have intended to convey or that would be within ERB's delegated authority to fashion in furthering the policy embodied in ORS 243.672.
[17] We do not reach the question of whether ERB correctly rejected petitioners' claim that the district's action interfered with, coerced, or restrained Poole "in" the exercise of a protected right because the analysis of that claim will be significantly affected by whether petitioners have adequately established a "because of" claim. See Spray Education Association and Walt Short, 11 PECBR at 218-19 (unless employment action is inherently destructive of protected rights irrespective of employer's motive for taking the action, an "in" claim usually is derivative in nature and depends on employee's success in establishing a violation under the "because of" prong of ORS 243.672(1)(a)).
[18] See Minnesota v. National Tea Co., 309 U.S. 551, 557, 60 S.Ct. 676, 84 L.Ed. 920 (1940).