Argued and submitted August 13, 2009, affirmed March 31, 2010

AFSCME COUNCIL 75, LOCAL 3694,
*Respondent,*

*v.*

JOSEPHINE COUNTY,
*Petitioner.*

AFSCME COUNCIL 75, LOCAL 3694,
and Josephine County,
*Respondents,*

*v.*

OPTIONS FOR SOUTHERN OREGON, INC.,
*Petitioner.*

Employment Relations Board
UP2606; A137652

228 P3d 673

Kirk S. Peterson argued the cause for petitioner Josephine County. With him on the briefs was Bullard Smith Jernstedt Wilson.

Mark P. Amberg argued the cause for petitioner Options for Southern Oregon, Inc. With him on the briefs were David R. Denecke, Jens Schmidt, and Harrang Long Gary Rudnick P.C.

Barbara J. Diamond argued the cause and filed the brief for respondent AFSCME Council 75, Local 3694.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Ortega, Judge.

SCHUMAN, P. J.

**SCHUMAN, P. J.**

AFSCME Council 75, Local 3694 (AFSCME), filed a complaint with the Employment Relations Board (ERB) accusing Josephine County (county) of committing an unfair labor practice by outsourcing its mental health services in retaliation for an AFSCME strike in which mental health workers played a prominent role. The county responded that the decision to outsource mental health services resulted from a long-standing plan that preexisted the strike. After a three-day contested case hearing, an administrative law judge ruled in favor of AFSCME. ERB agreed and ordered the county to cease and desist from transferring its mental health services to other organizations, reinstate the former county employees who had been transferred, make the former county employees whole, make AFSCME whole for lost dues and fair share payments, and pay AFSCME a civil penalty. The county seeks judicial review, arguing that ERB's conclusions of law are not supported by substantial evidence in the record and that, in any event, the reinstatement remedies are legally erroneous. We affirm.

ERB found the following facts and, except where noted, they are undisputed. *See Meltebeke v. Bureau of Labor and Industries*, 322 Or 132, 134, 903 P2d 351 (1995) (uncontested findings are adopted on judicial review). In 2005, contract negotiations between AFSCME and the county became contentious and difficult; in response to a predicted loss of federal funds, the county was proposing a number of changes that the union found objectionable. AFSCME became frustrated by the lack of progress in negotiations and engaged in a number of activities designed to encourage bargaining unit members to support the union's negotiating position, gain public support for AFSCME's efforts to achieve a contract, and place pressure on the county to settle the bargaining dispute. However, AFSCME and the county were unsuccessful in resolving their contract dispute and, on December 29, 2005, AFSCME notified the county that it would strike unless the parties reached an agreement by January 9, 2006. No agreement was reached, and AFSCME went on strike. Employees from the county's Mental Heath Division strongly supported the strike, with approximately 80 percent of the workers participating, in contrast to other divisions' average

of 40 percent. The strike ended on January 12, 2006, when AFSCME and the county reached a tentative agreement.

During and before the contract negotiations and strike, the county had entertained proposals to outsource mental health services. Indeed, as early as 1995, and again in 2003, the county had considered such proposals but rejected them after learning that, because mental health services were largely funded by grants, outsourcing would not save the county money but, to the contrary, result in a loss of funds—$854,000 if the 2003 proposal had been implemented. Beginning in 2005, however, the county once again began to investigate privatizing mental health services. In October 2005, county commissioners met with a private provider, and a county mental health official "spoke about the possibility of contracting out mental health programs by July 2006, and explained that some cost savings could be achieved by doing so." Yet in December 2005, a county analysis showed that, again, losing the grant and other money that mental health services brought into the county general fund would result in a net financial loss. ERB found that the amount of loss would be $469,257; the county disputes that amount and contends that the accurate figure was $38,724. Nonetheless, the county continued to explore privatization.

As related above, the AFSCME strike ended on January 12, 2006. A week later, one of the county commissioners told the county's mental health advisory board that the board of county commissioners, two of whose three members had run for office on a platform of reducing the size of county government, was still considering privatization. A few days later, the same commissioner appeared on a local radio show and told the listeners that "there's been some discussion, just very preliminary stages, but what parts of the mental health program could also be * * * better served * * * by being in the private sector." At the same time, a commissioner met with state officials to discuss privatization. Shortly thereafter, the board of county commissioners officially decided to proceed with privatization and transferred the county's mental health services to Options for Southern Oregon, Inc. (Options). On March 13, the commissioners issued a press release announcing the decision and explaining:

"These changes will help to assure the continued success of the affected programs, allowing for the continued delivery of services to the public, in an increasingly difficult fiscal environment, due in part to the continued rising County costs and due to an uncertain future regarding County revenues from Federal and State of Oregon sources."

Two days later, the board passed a resolution announcing transfer of mental health programs. The resolution stated:

"WHEREAS the expected loss of * * * revenues in Josephine County and rising costs of County expenses has created an uncertain financial future for the County;

"WHEREAS it is in the best interest of the County to downsize its workforce and outsource services;

"* * * * *

"NOW, THEREFORE, IT IS HEREBY RESOLVED that effective July 1, 2006, [community mental health programs] shall be transferred to [Options]."

In a letter to AFSCME explaining the reason for privatization, a human resources officer for the county summarized:

"The subcontracting out of HHS programs will greatly reduce the overhead expenses and help assure the continued success of the affected programs, allowing for the continued delivery of services to the public in an increasingly difficult fiscal environment, due in part to the continued rising County costs and due to an uncertain future regarding County revenues from Federal and State of Oregon sources."

Two witnesses for AFSCME, however, testified that they were told by county officials that, had it not been for AFSCME's strike, the privatization would not have occurred. The county and the officials denied making those statements. The actual transfer of services occurred after an agreement was approved by the board of commissioners on June 28, 2006. As a result, all but two AFSCME members who were employed by the county were transferred to other organizations, where they were guaranteed the same salaries but were no longer eligible to participate in the state's retirement system or to be represented by AFSCME. AFSCME lost 125

bargaining unit members, costing the union approximately $4,000 per month in dues.

AFSCME then filed this complaint alleging an unfair labor practice. ERB concluded that the county's decision to privatize was motivated by AFSCME's strike, that the cost-saving explanation was pretextual, and that the decision resulted in interference with the existence of the union, in violation of ORS 243.672(1)(a) and (b), set out below. To remedy this violation, ERB ordered the county to cease and desist from transferring mental health services to outside organizations, to reinstate and make whole transferred employees, to make AFSCME whole, and to pay a $1,000 fine.

On judicial review, the county advances 10 assignments of error that can be divided into two categories. First, the county argues that ERB erred in finding that the transfer of mental health services to Options and other noncounty providers was motivated primarily by the strike; that finding, according to the county, is not supported by substantial evidence or substantial reason. Second, the county argues that, even if ERB correctly found the violation, the restoration of mental health services to the county and reinstatement of former employees was error.

Before addressing those specific assignments of error, we must dispose of the county's apparently overarching allegation. In its "Summary of Argument," the county asserts:

> "This is a judicial review of a contested case where a state agency ignored its own rules and precedents and blatantly decided, at the onset, what and whom to believe, simply on the status of the parties (*i.e.*, a labor organization and a public employer). To achieve its desired ideological objectives, ERB wholly ignored the contemporaneously created pre-strike documentation that confirms that County's decision-making process * * * was for wholly legitimate reasons * * *.
>
> "* * * * *
>
> "Due process requires a neutral, unbiased agency adjudication and prohibits prejudgment of adjudicative facts. A review of the whole record and the applicable law, however,

shows that ERB deprived the County of due process and ignored the record * * *."

The county, however, presents no evidence—and we find none—to support either the assertion (we cannot call it an argument) based on the Due Process Clause or the *ad hominem* attacks on ERB members, beyond the fact that ERB ruled in favor of the county's opponents. We therefore reject the county's allegation without further comment—except to note that those types of unsupported attacks are inappropriate and unprofessional.

 The county's first seven assignments of error challenge on various grounds ERB's conclusion that the county violated ORS 243.672(1)(a) and (b), provisions within the Public Employees Collective Bargaining Act (PECBA):[1]

"(1) It is an unfair labor practice for a public employer or its designated representative to do any of the following:

"(a) Interfere with, restrain or coerce employees in or because of the exercise of rights guaranteed in ORS 243.662.

"(b) Dominate, interfere with or assist in the formation, existence or administration of any employee organization."

Subsection (1)(a) contains two separate prohibitions: first, it prohibits restraint, interference, or coercion of employees "because of" the exercise of protected rights; and second, it prohibits restraint, interference, or coercion of employees "in the exercise of" protected rights. With respect to restraining employees "because of" their exercise of rights, "the emphasis is on the *reasons* for the employer's action: Why did the employer do what the employer did?" *Portland Assn. Teachers v. Mult. Sch. Dist. No. 1*, 171 Or App 616, 623, 16 P3d 1189 (2000) (emphasis in original). With respect to restraining employees "in the exercise of" their rights, "the emphasis is on the *consequences* of a particular action: Is the natural and probable effect of that action to deter employees from exercising a protected right?" *Id.* (emphasis in original). To prevail on a "because of" claim, a complainant "must

---

[1] AFSCME also alleged a violation of ORS 243.672(1)(c), but ERB rejected that allegation and AFSCME does not cross-assign error to that ruling.

establish that the employer was motivated *by the exercise of the protected right* to take the disputed action." *Id.* (emphasis in original). To prevail on an "in the exercise of" claim, "neither motive nor the extent to which employees actually were coerced is controlling; the essential issue is only whether, objectively viewed, the action that the employer took under the particular circumstances would chill union members generally in their exercise of protected rights." *Id.* at 624.

> "The ultimate issue of whether an employer acted coercively and was motivated to do so by the exercise of protected activity is a factual determination, one that ERB must make considering the nature of the action taken and the circumstances in which it was taken. In testing whether the record supports ERB's resolution of that issue, we review for whether ERB has correctly identified the applicable legal principles; we further review for substantial evidence and for substantial reason. *See generally* ORS 183.482(8)."

*Id.* at 626-27. Substantial evidence to support a finding of fact is evidence that, viewing the record as a whole, would permit a reasonable person to make that finding. ORS 183.482(8)(c); *Armstrong v. Asten-Hill Co.*, 90 Or App 200, 206, 752 P2d 312 (1988).

█ In this case, ERB found that the county privatized mental health services "because of" the AFSCME strike, and that action caused a derivative restraint "in the exercise of" members' rights. ERB based those findings on both direct and circumstantial evidence. The direct evidence consisted of the two statements from county officials to AFSCME members that, had AFSCME not gone on strike, the privatization would not have occurred. The county argues that the two officials who made the statements testified that they did not do so, and that "it is more probable than not" that the statements were never made. We reject the county's contention for two reasons. First, we review findings of fact for substantial evidence, not for a preponderance of the evidence. ORS 183.482(8)(c). Second, ERB provided detailed and logical explanations for its credibility findings. One statement was allegedly made by Granat, a Human Resources officer; ERB found that he told Burdis, an AFSCME member, that "if it were not for the strike, there would have been no discussion

of privatization," and that, if asked, he (Granat) would deny having made that statement. In crediting the AFSCME member's account, ERB explained:

> "Granat testified that he did not recall this conversation with Burdis. We note that the testimony of a witness that he or she does not remember a particular event does not deny that the event occurred; it simply means that the witness cannot remember what happened. Burdis's testimony regarding his conversation with Granat was clear, detailed, and consistent with the evidence presented. In addition, Burdis recorded the conversation in contemporaneous notes. Because Burdis's recollection of his conversation with Granat is more exact than Granat's, we find it more likely than not that Granat made the statements attributed to him."

(Citations omitted.) The second statement was made by Adair, a county mental health director, who allegedly told a different AFSCME member, Thor, that "the contract with Options would not have been made if AFSCME had not gone on strike." ERB believed the AFSCME member. We quote ERB's explanation at length because it is a good example of the thoroughness of its 46-page, single-spaced opinion and order:[2]

> "At the hearing, Adair [the mental health director] denied telling Thor [the AFSCME member] that the County would not have transferred mental health programs had there not been a strike. Based on the following considerations, we find Thor's testimony regarding his conversation with Adair to be more credible.

> "Adair was an ardent supporter of privatizing County mental health services. He testified that he had urged privatization for years so that the Mental Health Division would not have to contribute to the County ISF and could instead use this money for services and programs. Adair testified that after he became interim director of the Mental Health Department in 2004, he began 'to push on the commissioners about privatization. I just started to—I'll use the term—nag on them about privatization and about letting the agency go. And I used the term almost every time I

---

[2] The full text can be found at: http://www.oregon.gov/ERB/orders/up02606.pdf (accessed Mar 22, 2010).

met with them. I would almost pound on the table, "let my people go." '

"Although Adair characterized himself as an impassioned supporter of privatization, he was surprisingly unsure about when the [Board of County Commissioners (BCC)] decided to privatize and whether he was present when that decision was made. When asked on direct examination whether he was present when the BCC made the decision to privatize, Adair responded: 'I can't answer definitively yes or no. I probably was.' When asked again on cross-examination if he was present when the BCC decided to privatize, Adair answered that he was not.

"Adair also testified that he first learned that the BCC supported privatization when the County commissioners voted to take this action at their March meetings. The record shows, however, that Adair was present at a February 14, 2006 meeting of County managers at which O'Brien announced that the BCC's decision to privatize mental health services was 'official.'

"We find Adair's testimony to be internally inconsistent and inconsistent with other documentary evidence. We also find it highly unlikely that Adair, who described himself as a fervent advocate of privatization who had been urging the BCC to take this action for two years, would have difficulty remembering when the BCC made its decision to privatize and whether he (Adair) was present during these deliberations. We also find it improbable that Adair would forget about a meeting where it was announced that the BCCs had made an 'official' decision to privatize. Because we conclude that Adair's testimony regarding his knowledge of the BCC's decision to privatize is not credible due to its inherent implausibility, we give little credence to his testimony regarding his conversation with Thor. Consequently, we also find that his testimony concerning his April conversation with Thor is not credible. By contrast, we find Thor's testimony straightforward, consistent, and therefore credible."

(Citations omitted.) The county rejects these credibility findings and provides arguments in support of Granat's and Adair's version of events. Those arguments are not frivolous, and, had ERB found that Granat and Adair had accurately testified, we could conclude that those findings were supported by substantial evidence. Our duty, however, is not to

reweigh the opposing testimony to determine which is more persuasive; it is to decide whether a rational person, viewing the whole record, could reach the same findings as ERB. ORS 183.482(8)(c). Under that standard, we reject the county's challenge to ERB's credibility findings.

In addition to the direct evidence provided by the county officials' statements, ERB discussed and relied on circumstantial evidence as well. In particular, ERB noted that mental health department employees were disproportionally represented in strike leaders and supporters. Summarizing, it also noted the

> "suspicious timing of the County's decision-making process, and the equally suspicious speed with which the transfer was implemented. In addition, we have considered the marked difference between the transfer of mental health programs and the transfer of other County programs. We also note that the County never established any legitimate reason for the transfer. To the contrary, the transfer caused the County to lose money in a time of tremendous financial uncertainty * * *."

The county, for its part, presented evidence that privatization of mental health services had been planned since long before the strike and that several officials testified that the transfer was motivated not by a desire to save money but to improve the quality of services. It also points out what it characterizes as significant weaknesses and errors in ERB's opinion. In response, AFSCME does not deny that privatization was discussed and even tentatively planned before the strike; its argument, rather, is that the tentative and hypothetical privatization became real and immediate because of the strike, and all of the county's other rationales were pretextual. In sum, each side in this fiercely contested case presented significant evidence, but there can be no doubt that, under the appropriate standard of review, a rational person viewing the entire record could have believed AFSCME's version. ERB's findings are supported by substantial evidence and its application of legal principles is correct. We reject the county's first seven assignments of error.[3]

---

[3] Several of the assignments of error target particular findings or implied conclusions, for example, that ERB erred in admitting into evidence the notes that Burdis claimed to have made immediately after his conversation with Adair, and

■ The county also argues that ERB erred in ordering reinstatement of transferred employees. Options joins the county in these assignments of error, on the presumption that reinstating former county employees to their county positions means that Options will no longer serve as the provider of mental health services. The parties agree on the legal principle that ERB has discretion in remedying violations of PECBA. In the exercise of its discretion, ERB must either act consistently with its prior practice or else explain why it has not done so. ORS 183.482(8)(b)(B). The parties also appear to agree that ERB's practice has been to order reinstatement when a public employer has violated a provision of PECBA, unless the employer has ended, disbanded, or closed the program in which the employees worked. *See Teamsters Local 670 v. City of Vale*, 20 PECBR 337 (2003) (applying principle).

The county argued to ERB that the present case falls within the *Teamsters Local 670* exception. ERB disagreed:

"We disagree with the County's contention that it went out of the business of providing mental health services * * *. We find that the County transferred mental health services to other organizations and did not close the Mental Health Division.

"In *Teamsters Local 670 v. City of Vale*, the employer completely disbanded its police department. City police no longer provided services; the city did not pay for any other agency to provide police services and had no future plans for doing so. In addition, the city exercised no control over law enforcement functions that were sometimes provided by county sheriff's personnel within the city. We did not order reinstatement even though the City failed to bargain in good faith before it acted.

"Here, none of these factors are present. Work formerly performed by AFSCME bargaining unit members continues to be done by the same people—the only difference is that these employees now work for organizations other than the County. As a local mental health authority under

---

by failing to conduct a "mixed motive" analysis, or by failing to conclude that the county would have privatized mental health services regardless of the strike. We have considered those assignments. To the extent that they are not subsumed into the general claim that ERB erred in ruling that the county violated ORS 243.672, we reject them without further discussion.

[ORS 430.630(10)(a)(A)], the BCC has retained some control over mental health services offered to County residents. For these reasons, we find that the County's actions constitute a transfer of mental health programs and not a closure of these programs."

We agree with AFSCME that ERB provided an adequate explanation of the differences between *Teamsters Local 670* and the present case. The county's mental health services were transferred, not discontinued, and the ultimate control over the results of the services (if not the means of providing them) remained with the county. The county paid Options to provide the exact same services that the county once provided. Former county employees were hired to perform the same jobs. No "closure" has occurred. ERB acted within its discretion in ordering reinstatement as a remedy for the county's unfair labor practice.

Affirmed.