Argued and submitted January 24, 2012, reversed and remanded for
reconsideration March 27, 2013

SAIF CORPORATION
and McIntyre Construction-Fuller Cabinets,
*Petitioners*,

*v.*

Delbert L. SATTERFIELD,
*Respondent*.

Department of Consumer and Business Services
0900060H; A148357

303 P3d 325

David L. Runner argued the cause and filed the briefs for
petitioners.

Brian L. Pocock argued the cause and filed the brief for
respondent.

Before Ortega, Presiding Judge, and Haselton, Chief
Judge, and Sercombe, Judge.*

SERCOMBE, J.

---

* Haselton, C. J., *vice* Brewer, Judge pro tempore.

## SERCOMBE, J.

Petitioners SAIF Corporation (SAIF) and McIntyre Construction-Fuller Cabinets (McIntyre)[1] seek judicial review of a final order of the Director of the Department of Consumer and Business Services (director). In that order, the director concluded that SAIF had improperly terminated claimant's eligibility for vocational assistance, finding that SAIF had not obtained "new information" indicating that claimant was no longer eligible for such assistance as then required by *former* OAR 436-120-0350 (12/1/07).[2] Petitioners assign error to that conclusion, specifically arguing that three new medical evaluations of claimant conducted over one year after the initial eligibility determination in fact contained "new information" and that the director therefore erred in refusing to consider that information in making his determination. On review for substantial evidence and substantial reason, ORS 183.482(8); *Portland Assn. Teachers v. Mult. Sch. Dist. No. 1*, 171 Or App 616, 627, 16 P3d 1189 (2000), we agree with petitioners and conclude that the director erred in failing to consider the three new medical evaluations based on an erroneous finding that they contained no "new information." Accordingly, we reverse and remand for reconsideration.

On November 11, 2005, claimant seriously injured his right wrist and left ankle while working as a carpenter for McIntyre. SAIF, McIntyre's workers' compensation insurer, ultimately accepted claims for "non-displaced intra-articular fracture of the right distal radius, triangular fibrocartilage complex (TFCC) tear, right, left ankle lateral

---

[1] For ease of reading, we refer to SAIF and McIntyre collectively as "petitioners" unless distinction is necessary.

[2] Although OAR 436-120-0350 was renumbered and amended in 2009, all subsequent references to that rule refer to the December 1, 2007, version. That version provided, in pertinent part, that

"[a] worker is ineligible or the worker's eligibility [for vocational assistance] ends when any of the following conditions apply:

"(1) The worker does not or no longer meets the eligibility requirements as defined in [*former*] OAR 436-120-0320 [(12/1/07)]. *The insurer must have obtained new information which did not exist or which the insurer could not have discovered with reasonable effort at the time the insurer determined eligibility.*"

(Emphasis added.)

puncture wound, and left ankle peroneal tendon partial tear."[3] A vocational rehabilitation counselor subsequently prepared an analysis of claimant's job at the time of injury, an occupational therapist conducted a physical capacity evaluation (PCE), claimant's attending physician concurred with the PCE, and the claim was initially closed on October 29, 2007, with an award of nine percent whole person impairment based on the injury to claimant's right wrist.[4] On that date, SAIF notified claimant that he was eligible for vocational assistance. In turn, based on that eligibility determination, claimant began an approximately 21-month vocational training program at Chemeketa Community College designed to facilitate his transition to the occupation of "building inspector."

As noted, on August 16, 2007, prior to SAIF's initial closure of the claim and determination that claimant was eligible for vocational assistance, a PCE was performed by an occupational therapist, Maloney. She conducted several tests to measure range of motion, strength (including grip and pinch strength), and functional capacity in claimant's right wrist. That objective testing produced the following findings:

- Range of motion (right compared with left): pronation 60/60, supination 60/75, dorsiflexion 45/65, palmar flexion 30/65, radial deviation 15/20, ulnar deviation 20/30.

- Strength: rated 5/5 in all muscles (tested bilaterally), with the exception of "5-/5" strength in the right flexor carpi radialis longus/brevis and the right extensor carpi radialis "with the extensor carpi ulnaris and flexor carpi ulnaris testing 4+/5."

---

[3] Claimant's ankle injury is not at issue on judicial review; we therefore limit our recitation of the facts, where possible, to those relevant to the right-wrist injury.

[4] The closure was briefly set aside in early 2008, but the claim was quickly reclosed on July 9, 2008, with the same nine percent whole person impairment award and "work disability of 12%." However, on August 29, 2008, the closure was again set aside on reconsideration by the Department of Consumer and Business Services's Appellate Review Unit (ARU). The claim then remained open until SAIF reclosed it in connection with its revocation of claimant's eligibility for vocational assistance—the subject of this proceeding—on January 2, 2009.

- Grip and pinch strength (right compared with left): grip 55/106, lateral prehension 10/21.5, palmar prehension 6/16.5.

- Functional capacity: limited to "occasional" pinching, gripping, and "[d]exterity/[c]oordination" on the right, unable to crawl or climb ladders, rarely able to operate hand controls with the right hand.

Ultimately, in assessing claimant's physical capacity in the context of the "essential functions of [his] job at injury[,]" Maloney opined that claimant was "performing at the light physical demand performance level" and was unable to perform the full duties of his regular work as a carpenter. She specifically concluded that claimant was unable to lift objects weighing over 10 pounds with both hands, carry any object weighing more than 10 pounds for 40 feet or any object weighing more than 15 pounds for 20 feet, push with "more than rare frequency" with his right hand, frequently use extension ladders, or frequently use "vibrating or impact tools." She further recommended that claimant "[l]imit loads and forces" to 15 pounds for bilateral tasks, "[l]imit right hand tasks to occasional frequency for pinching, gripping and dexterity[,]" "[a]void crawling and ladder climbing completely[,]" and "[a]void work on unprotected heights, due to slow response with right grip." Importantly, Maloney later acknowledged, in March 2009, that she "only consider[ed] the findings of [her] testing valid for six months" given that "the factors quite often change through the passage of time."

On June 15, 2007, Dr. Tavakolian, an orthopedic hand surgeon and claimant's attending physician with respect to the wrist injury, opined that claimant was medically stationary and capable of returning to modified work with restrictions consisting of no pulling or lifting more than 30 pounds and "[n]o hammering." On September 11, 2007, however, Tavakolian concurred with Maloney's evaluation and findings—adding that claimant was "[s]omewhat limited" in repetitive use of his right wrist. Tavakolian made the following objective findings:

- Range of motion (right compared with left): dorsiflexion 45/60, palmar flexion 35/67, radial deviation 15/20, ulnar deviation 15/25.

- Strength: rated 4/5 in the right wrist.

Later, on April 3, 2008, claimant again saw Tavakolian, complaining of continued pain in his right wrist. Tavakolian obtained radiographs of the wrist, noted an "abnormality in the cortical contour between the scaphoid and lunate fossa of the distal radius[,]" and otherwise found no radiographic abnormality beyond "slight evidence" of the original fracture. He wrote, "I would really recommend vocational retraining to [claimant]. He is considering a career in building inspection which I think would be appropriate for his right wrist." Claimant inquired about a second opinion due to his asserted level of pain and mentioned an orthopedic hand surgeon, Dr. Wilson, to whom Tavakolian referred claimant for evaluation of continued "right wrist pain."

Wilson examined claimant on September 26, 2008, over one year after the PCE conducted by Maloney. He noted that claimant rated the pain in his right wrist at 3/10 at rest, 5/10 with light use, and 9/10 with "heavier use" and that claimant had "been in a splint off and on for approximately two years." Upon physical examination, Wilson found normal range of motion in claimant's right wrist with the exception of "slightly decreased active [range of motion] of the right wrist in volar flexion compared to the left." With respect to strength, Wilson found that claimant's grip strength "measure[d] 65 pounds on the right dominant side and 102 on the left[,]" while his "pinch strength measure[d] 5 on the right and 18 on the left." Wilson noted "tenderness diffusely across the dorsal aspect of the wrist proximal to the wrist joint in the extensor tendons in compartments 1-6" but stated that he "could find no reason that [claimant] was having pain[,]" that "[a]ll of [claimant's] wrist instability tests * * * [were] normal[,]" and that he found "no other abnormalities in the hand." Likewise, Wilson opined that X-rays with three views of the wrist "were completely normal."

Ultimately, Wilson recorded a diagnostic impression of "[s]ymptom magnification with no evidence for an objective wrist problem[,]" opining that claimant "could return to full duty without restrictions at whatever job he was doing prior his injury." He further stated that he would "highly

recommend that [claimant] undergo an [independent medical examination (IME)] for additional confirmation of secondary gain behavior as there are literally no objective findings on this patient explaining his pain."[5]

Consistent with Wilson's recommendation, Dr. Swan conducted an IME of claimant on December 2, 2008, including a chart review and physical examination "requested to determine any ongoing need for treatment and medically stationary status" as well as identification of "ability to work issues." Swan noted that claimant reported continued pain "at a moderately severe level on the dorsum of his right wrist." After performing a physical examination, Swan made findings as to range of motion in claimant's right wrist (mirroring Maloney's methodology in comparing the right and left) as follows: palmar flexion 55/60, dorsiflexion 65/70, radial deviation 22/28, and ulnar deviation 32/36. He noted that the "loss of range of motion in the right wrist as compared with the contralateral uninjured left wrist" were "not unexpected, given the injuries to the right wrist and their treatment." With respect to strength in the right wrist, Swan stated that "[m]otor strength testing [was] graded 5/5 in all the muscles of the upper extremity including the * * * wrists and the intrinsic muscles of the hand." Grip-strength testing demonstrated "grip strength of 80 pounds on the right, [and] 120 pounds on the left," while "[p]inch grip [was] 28 on the right and 30 on the left." Swan found "no localizing tenderness that [was] reproducible at the wrist" and "no instability demonstrated in the wrist or the hand" and, although he noted "some increased tenderness at the radial ulnar joint dorsally at the right wrist[,]" he found that it was "not consistently reproduced" when claimant was distracted. X-rays depicted normal healing, and an MRI conducted on May 8, 2006, in connection with the injury "demonstrate[d] the ligaments to be intact."

Swan found that claimant was medically stationary and, in addressing claimant's condition as a whole in response to questions posed by SAIF, ultimately opined:

[5] For his part, in response to a letter from SAIF presenting Wilson's findings, Tavakolian expressly disagreed—rejecting Wilson's ultimate opinion that claimant "suffers from symptom magnification with no evidence for an objective wrist problem[.]"

"The examination of [claimant] is marked by pain behavior. There is verbalization of pain, inconsistent effort on strength testing, giveway findings, which are nonatatomic [*sic*] and nonphysiologic. There are inconsistencies on palpation and the subjective reports of pain on palpation. There are inconsistencies between demonstrated range of motion in formal testing and in activities throughout the exam, including disrobing and dressing. Strength testing, in particular is notable, and he performs activities both in rip and usage of the wrist * * * that are very inconsistent between the examination activities and on formal testing.

"* * * * *

"I do believe [claimant has] a demonstrated loss of range of motion in the right wrist[.] * * * There is no * * * muscle strength loss that can be demonstrated on this examination.

"* * * * *

"[Claimant] does not demonstrate on the examination today any objective valid findings that would require restrictions on his use of his right wrist * * *. There is no basis for work restrictions and [claimant] is capable of performing the regular work that he was performing at the time of injury * * *. He may perform the work of a carpenter without restrictions.

"* * * * *

"I concur with Dr. Wilson that [claimant] does show clear cut evidence of pain behavior. There is symptom magnification with inconsistent objective findings to support the subjective complaints. * * * Given a setting in which [claimant] reported early on a desire not to return to the work he was performing when initially injured, and his repeated expression of his desire to do alternate work, there clearly is secondary gain involved. [Claimant] has also demonstrated, repeatedly, returning for medical care for complaints of pain that are not substantiated by new or objective findings. And given the thoroughness of his evaluation and treatment at every point in time, this also would be most consistent with secondary gain issues."

Tavakolian initially concurred with Swan's "opinions as they pertain[ed] to [claimant's] right hand and wrist conditions"; however, soon after, on January 12, 2009, Tavakolian again examined claimant—ultimately noting on

January 29 that his concurrence with Swan had been "partially in error." Tavakolian based that statement on claimant's "clearly documented loss of wrist motion[,]" which, he noted, generally leads to "some loss of strength." He characterized "the secondary gain suggestion" as "mere speculation" and ultimately opined:

> "Although I believe [that claimant] may have features of secondary gain as noted in Dr. Swan's note as well as Dr. Wilson's note, I also believe that he has wrist stiffness and loss of wrist strength from his original distal radius fracture and TFCC tear. Both distal radius fractures and TFCC tears typically lead to loss of strength and motion and I believe these findings on exam are consistent with [claimant's] injuries and are not of a psychological nature."

Tavakolian further "disagree[d] with [Swan's] conclusion that [claimant] could return to his regular work" and opined that the "most accurate assessment of [claimant's] strength is the [PCE] of August 16, 2007 * * *."

Based on the reports of Wilson and Swan, SAIF concluded that claimant could return to his regular work as a carpenter. Consequently, on January 2, 2009, SAIF terminated claimant's eligibility for vocational assistance and reclosed the claim. Claimant appealed that action on January 29, requesting review by the director.

Claimant's request for administrative review of SAIF's action was initially delegated by the director to the Workers' Compensation Division's Employment Services Team (EST) "for investigation and finding of facts." Subsequently, on April 1, 2009, claimant underwent a medical arbiter panel examination (MAE). Drs. Nagel, Liberatore, and Miller (the MAE panel) reviewed claimant's medical records and collectively conducted a physical examination. That examination produced the following objective findings regarding claimant's right wrist:

- Range of motion (right compared with left): dorsiflexion 39/42, palmar flexion 66/63, radial deviation 21/30, ulnar deviation 34/54.

- Strength: rated 5/5.

In addition, the MAE panel found decreased range of motion in claimant's right elbow, measuring supination at 53 degrees compared with 90 degrees in the contralateral left elbow, and stated that "the reduced supination of the right elbow can be explained by the wrist injuries." Ultimately, notwithstanding claimant's "loss of right upper extremity range of motion[,]" the MAE panel opined that claimant was "not significantly limited in the ability to repetitively use [his] right wrist/forearm[.]"

The next day, a vocational reviewer, acting on behalf of EST as the director's delegate, issued an order setting aside SAIF's decision to terminate claimant's eligibility for vocational assistance. SAIF sought review of that order, and a hearing was convened before an administrative law judge (ALJ) on December 21, 2009. Following closure of the record, the ALJ issued a proposed and final order on November 3, 2010, affirming EST's decision to set aside SAIF's termination of claimant's eligibility. SAIF then requested director review, and, on February 17, 2011, the director issued a final order affirming both previous orders directing SAIF to restore claimant's eligibility for vocational assistance. The director, in concordance with EST's analysis, determined that the reports of Wilson, Swan, and the MAE panel "d[id] not constitute new information" within the meaning of OAR 436-120-0350 and therefore could not be considered as a basis for terminating claimant's eligibility for vocational assistance.

Before setting forth the director's specific reasoning with respect to those medical evaluations, we first provide some background regarding the applicable rule and, in particular, the director's interpretation of that rule. *See Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 142, 881 P2d 119 (1994) (deference to an agency's interpretation of its own administrative rule is required if the interpretation is "plausible" and not "inconsistent with the wording of the rule itself, or with the rule's context, or with any other source of law"); *Johnson v. Employment Dept.*, 187 Or App 441, 447-48, 67 P3d 984, *rev den*, 336 Or 60 (2003) ("If the department had interpreted its [own] rule at the conclusion of a contested case proceeding, there would

be no question that we would defer to that interpretation as long as it was plausible."). Again, OAR 436-120-0350 provides, in pertinent part:

"A worker is ineligible or the worker's eligibility [for vocational assistance] ends when any of the following conditions apply:

"(1) The worker does not or no longer meets the eligibility requirements as defined in [*former*] OAR 436-120-0320 [(12/1/07)]. *The insurer must have obtained new information which did not exist or which the insurer could not have discovered with reasonable effort at the time the insurer determined eligibility.*"

(Emphasis added.) The director (beginning with his delegate, the vocational reviewer, in the first of the three orders issued in this proceeding) relied primarily on case law in interpreting that rule. Specifically, the director principally relied upon and adopted our 2001 construction—in *Barrett Business Services, Inc. v. Stewart*, 178 Or App 145, 151, 35 P3d 1055 (2001)—of "later obtained evidence" in the context of so-called "backup denials" governed by ORS 656.262(6)(a) (1997), *amended by* Or Laws 2009, ch 526, § 1. In *Barrett Business Services, Inc.*, we stated that "newly discovered" or "later obtained" evidence "does not include new comments on or analyses of *preexisting* factual data; it *includes only new facts in the narrowest sense.*" *Id.* (emphases added). We further stated, mirroring the crux of the language in OAR 436-120-0350(1), that new evidence "does not include evidence that the employer either had, or in the exercise of reasonable diligence should have had, at the time of [claim] acceptance, *nor does it include the restatement, reevaluation, analysis, or confirmation of such evidence.*" *Id.* (emphasis added). The director adopted those principles in construing the term "new information" in OAR 436-120-0350, and we conclude that the director's interpretation was "plausible." *Don't Waste Oregon Com.*, 320 Or at 142.[6]

---

[6] In any event, petitioners do not take issue with the director's interpretation of OAR 436-120-0350; rather, as discussed below, they simply assert that the director unreasonably applied that rule after misinterpreting the reports of Wilson, Swan, and the MAE panel.

With that interpretation of "new information" in place, the director reasoned as follows in affirming the ALJ's order:

> "Under the definition of new evidence established as precedent in the decisions discussed above, the facts upon which [SAIF] relied here do not constitute new information. *No new facts were developed in the examinations that occurred after [SAIF] found claimant eligible* [for vocational assistance]. The only additional information that became available was the opinions from different doctors[—namely, Wilson, Swan, and the MAE panel]. *Those opinions were only a re-evaluation of facts, including claimant's physical condition, that [SAIF] possessed before it found claimant eligible.*"

(Emphases added.)

On judicial review, petitioners argue, simply, that the director based the above-quoted findings on a misreading of the record such that his conclusion was not supported by substantial reason.[7] That is, they argue that, in comparison with the information available when SAIF initially found claimant eligible for vocational assistance on October 29, 2007—most importantly the findings made by Maloney and Tavakolian—Wilson's, Swan's, and the MAE panel's reports did not merely constitute "re-evaluation[s]" of preexisting evidence. Rather, petitioners argue, those reports contained new, objective findings based on clinical examination and testing. For instance, petitioners point to the new doctors' findings regarding both range of motion and strength in claimant's right wrist, arguing that those

---

[7] Petitioners frame the applicable standard of review in this court as follows: "[T]he director committed an error of law based on a misreading of the record and thus * * * the director's order is not supported by substantial reason." We note here that our standard of review extends beyond review for substantial reason—primarily encompassing review for substantial evidence with respect to the director's factual findings on the issue of whether Wilson's, Swan's, and the MAE panel's reports contained information that did not exist, and was not available, when claimant was deemed eligible for vocational assistance in October 2007. *See, e.g., Strutz v. Employment Dept.*, 247 Or App 439, 442, 270 P3d 357 (2011) ("We review the board's decision to determine whether its factual findings are supported by substantial evidence. In light of the board's factual findings, we then determine whether its conclusions reasonably follow from the facts found, that is, whether its conclusions are supported by substantial reason." (Citations and internal quotation marks omitted.)); *Portland Assn. Teachers*, 171 Or App at 627 (similar).

findings constituted "'new information' compared to what even the PCE reviewer conceded were outdated findings."[8]

Claimant responds, for the most part, by addressing the record as a whole as it bears on the merits of SAIF's termination of claimant's eligibility for vocational assistance. Aside from brief statements concurring with the ALJ's and the director's ultimate conclusions that the medical evaluations at issue did not contain any new information, he fails to specifically address petitioners' contention that Wilson's, Swan's, and the MAE panel's evaluations contained "new information" within the meaning of OAR 436-120-0350 as interpreted by the director.

We agree with petitioners, albeit for a slightly different reason. Although, as noted, petitioners characterize the issue that they raise as one of "substantial reason," their contention that the director misread Wilson's, Swan's, and the MAE panel's evaluations also raises a question of substantial evidence. *See Armstrong v. Asten-Hill Co.*, 90 Or App 200, 206, 752 P2d 312 (1988) (substantial evidence supports a finding of fact when, viewing the record as a whole, the evidence would permit a reasonable person to make that finding). That is, viewing the record as a whole, could a reasonable person have concluded that the three new doctors' reports contained nothing more than "re-evaluation[s]" of preexisting evidence? Stated differently, could a reasonable person have concluded that the three reports did not contain new, objective medical findings regarding the current strength and range of motion in claimant's right wrist as compared with the PCE and Tavakolian's 2007 opinions? We conclude that the answer is "no."

In comparison with previous testing for range of motion in claimant's right wrist (prior to SAIF's initial eligibility determination), the objective findings of Swan and the MAE panel each demonstrate, with the exception of the MAE panel's findings on ulnar deviation, dramatically increased range of motion in that wrist. For instance, in testing dorsiflexion and palmar flexion in particular, Maloney found differences of 20 degrees and 35 degrees, respectively,

---

[8] As noted, Maloney stated that she "only consider[ed] the findings of [her] testing [during the PCE] valid for six months[.]"

between the range of motion in claimant's dominant right hand and nondominant left hand. Neither Swan nor the MAE panel found a difference exceeding five degrees after performing the same tests.

Likewise, with respect to strength in claimant's right wrist, Maloney and Tavakolian did find some degree of weakness prior to SAIF's initial eligibility determination. However, Wilson, Swan, and the MAE panel—after physical examinations and objective strength testing—each rated claimant's strength in the right wrist at 5/5. Wilson additionally measured claimant's grip strength, with findings indicating an improvement (since Maloney's 2007 PCE) of at least six pounds of pressure on the dominant right side compared with the left.

Granted, in her PCE, Maloney originally rated claimant's strength in the right wrist at 5-/5 and 4+/5 and Tavakolian rated it at 4/5—numbers that do not indicate drastic impairment in the first instance. Nevertheless, whatever the degree of the initial impairment findings, after conducting new physical examinations Wilson, Swan, and the MAE panel did discover and report new information— even "in the narrowest sense," *Barrett Business Services, Inc.*, 178 Or App at 151—and that new information should have been considered by the director rather than dismissed as mere "re-evaluation of facts, including claimant's physical condition, that [SAIF] possessed before it found claimant eligible [for vocational assistance]." For example, a greater strength rating in claimant's right wrist (as compared with a rating generated over one year earlier), assessed based on a new physical examination and objective testing, constitutes neither "re-evaluation" nor "analysis" of preexisting evidence. While *claimant* was indeed "re-evaluat[ed]" by the three new doctors at issue, the preexisting *evidence* was not; an increased strength rating as described above constitutes new evidence, or "new information," in and of itself.

Finally, our analysis of the director's factual findings, while primarily resting on review for substantial evidence, also implicates the test of substantial reason. In short, the director unreasonably misread the new medical reports as providing nothing more than "re-evaluation[s]"

of preexisting evidence. *See Asten-Hill Co. v. Armstrong*, 100 Or App 559, 562-63, 787 P2d 890 (1990) (determining that the Workers' Compensation Board "unreasonably" "misread" and "substantially misstated" a doctor's opinion and further identifying "[t]he only reasonable reading" of that opinion).

In sum, under the director's interpretation of OAR 436-120-0350, to which we defer, the physical examinations and resultant reports of Wilson, Swan, and the MAE panel—generated well over one year after SAIF initially determined that claimant was eligible for vocational assistance—provided "new information" regarding claimant's right-wrist injury. The director's conclusion to the contrary was neither supported by substantial evidence nor substantial reason. We therefore conclude that the director erred in refusing to consider the medical reports of Wilson, Swan, and the MAE panel in determining whether SAIF properly terminated claimant's eligibility for vocational assistance. Accordingly, because the director's failure to consider that evidence necessarily precluded a finding that SAIF properly terminated claimant's eligibility given OAR 436-120-0350's express requirement that the insurer "obtain[ ] new information," we reverse and remand for reconsideration.

Reversed and remanded for reconsideration.